UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DEQUAN HALL,

                    Petitioner,

          v.

MICHAEL CAPRA,

                    Respondent.

20-cv-525 (NRM)

**MEMORANDUM AND ORDER**

NINA R. MORRISON, United States District Judge:

Petitioner DeQuan Hall, currently incarcerated in the custody of the New York Department of Corrections and Community Supervision, petitions this Court *pro se* for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. ECF No. 1. Following a jury trial in Kings County Supreme Court, Petitioner was convicted of attempted murder, assault, and criminal possession of a weapon on September 22, 2014, and sentenced to 18 years in prison followed by 5 years of post-release supervision. State Ct. R. Ex. D Order at 2, ECF No. 8-4.[1] Petitioner's conviction was affirmed on appeal to the New York Supreme Court, Appellate Division (the "Appellate Division"). Petitioner's request for leave to appeal to the New York Court of Appeals was denied. *People v. Hall*, 124 N.E.3d 762 (N.Y. 2019).

Petitioner filed a *pro se* habeas petition on January 27, 2020. Pet. at 7, ECF

---

[1] All page references use ECF pagination except where noted.

1

No. 1.  He raised four claims: (1) improper denial of an independent source hearing for the victim, Michael McDonald; (2) improper admission of bolstering and hearsay evidence, and improper use of the surveillance video for identification purposes; (3) prosecutorial misconduct on summation; and (4) excessive sentence.  ECF 1 at 3–4. In his amended petition dated February 20, 2023, Petitioner also asserted that he is actually innocent.  Am. Pet. at 6, ECF No. 12.

For the reasons set forth below, the petition is denied.

## FACTUAL BACKGROUND

The following facts are drawn from the state court trial record and are summarized "in the light most favorable to the verdict."  *Licausi v. Griffin*, 460 F. Supp. 3d 242, 250 (E.D.N.Y. 2020) (GRB) (quoting *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012)); *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008) ("We summarize the facts in the light most favorable to the government, given the defendants' convictions.").

### I.    Factual Background

Sometime early in the morning of January 10, 2013, Michael McDonald was riding a Manhattan-bound 3 train through Brooklyn with his friend Casnell James. ECF No. 8-1 at 771–72.  A group of men boarded the subway at the Rockaway station. *Id.* at 773.  One of the men and McDonald got into an altercation, and the man drew a gun.  *Id.* at 774–77.  One stop later, at the Saratoga station, the man fired the gun, shooting McDonald in the right cheek.  *Id.* at 780–82.

Police officers interviewed McDonald and James at the Saratoga station, shortly after the shooting, and obtained a description of the shooter. According to the police interviewers, James described the shooter as being in a group of five Black men, and the "one of them that was the shooter [had] a green bubble jacket with a cane and hat and sweatpants." *Id.* at 695. McDonald described the shooter as "a male wearing a green jacket who had braided hair . . . [a]nd was holding a cane," with a group of several men. *Id.* at 507. James also described a group of five men, including "one male black with a green jacket, braids, he had a cane and sunglasses. One male black with a black bubble jacket. And two male blacks with red jacket and hat." *Id.* at 560.

Immediately prior to the shooting, Officer Guess and his partner, Officer Darren Johansen, had observed a group of men who appeared to fit the description provided by McDonald and James. That same morning, they observed a group of five Black men enter a check cashing business; observed one of the men, who was wearing a green coat and sunglasses and using a cane, conduct a transaction at the business; and saw the group board a Manhattan-bound 3 train at the Rockaway station. *Id.* at 679–87, 827–33. A few minutes later, the officers responded to a radio call about the shooting at the next station, Saratoga. *Id.* at 693–94, 833–34.

After hearing the description of the shooter provided by McDonald and James, Officers Guess and Johansen returned to the check cashing business. *Id.* at 696–97, 836–37. The officers told the teller, "[t]here was five males. The one that was doing the transaction was wearing a green bubble jacket, dark sun[]glasses and hat and

black sweat pants," and the teller provided Petitioner's name and address. *Id.* at 697. The following day, officers returned to the business and obtained surveillance video footage. *Id.* at 915–16. The video depicted a man with a green jacket, a cane and black baseball hat walking into the business, along with several other individuals, *Id.* at 58, including a person wearing a red hat, and a notably tall man. *Id.* at 625–27.

Detective Douglas Chavis assembled a photo array of six individuals, including a photograph of Petitioner and five images provided by the computer in response to a prompt either for "male Blacks from the ages of 23 to 25," *id.* at 68, or between the ages of 22 and 30. *Id.* at 932. Petitioner was 28 years old at the time. *Id.* at 82–83.

Detective Douglas Chavis visited McDonald at the hospital at approximately 6:15 p.m. on January 10, 2013. *Id.* at 51. Det. Chavis showed McDonald the photo array, and McDonald identified Petitioner as the shooter. *Id.* at 52–54. McDonald was unable to speak, but he was conscious and alert and able to answer questions using gestures. *Id.* at 51–52.

At a later date, after Petitioner's arrest, Det. Chavis again visited McDonald in the hospital and showed McDonald the surveillance video that police had obtained. *Id.* at 212–14.[2] Det. Chavis did not ask McDonald any questions about the video. *Id.* at 302.

---

[2] Respondent contends that "although the exact date on which the detective showed McDonald the video is not in the trial record, it must have occurred between January 10, 2013 and January 16, 2013." Resp. Mem. at 12.

At approximately 2:56 p.m. on January 10, 2013, Det. Chavis showed James the same photo array of 6 individuals, which included a picture of Petitioner. *Id.* at 930–34. James did not identify any of the individuals pictured as the shooter. *Id.* at 933, 668. On the same day, at approximately 3:30 p.m., Det. Chavis showed James a photo manager containing 1,259 photos, including a picture of Petitioner, and James did not identify any of the images as the shooter. *Id.* at 934–38, 658.

At 1:30 p.m. on January 11, 2013, after Petitioner's arrest, Det. Chavis showed James the surveillance footage from the check-cashing business, and James identified the man pictured in the video wearing a green coat and using a cane as the shooter. *Id.* at 58–61. Det. Chavis then took James to the hospital to visit McDonald. *Id.* at 61. Approximately two hours later, James identified Petitioner as the shooter in an in-person lineup. *Id.* at 63.

## II.    Pre-Trial Hearings and Motions

### A. *Wade* Hearing

On October 31, 2013, Justice Wayne Ozzi held a *Wade* hearing on the potential suggestiveness of the identification procedures. *Id.* at 2.[3] The court heard testimony from Officer Guess and Det. Chavis regarding the surveillance video obtained by police and the identification procedures used with McDonald and James. *Id.* at 12–95. No testimony was presented regarding the fact that McDonald had viewed the surveillance video.

---

[3] "A *Wade* hearing is held to determine if a witness's identification is tainted by unduly suggestive identification procedures." *Animashaun v. New York*, No. 21-CV-2597 (KAM), 2024 WL 4266003, at *6 n.9 (E.D.N.Y. Sept. 23, 2024) (quotation omitted); *see U.S. v. Wade*, 388 U.S. 218 (1967).

On November 12, 2013, Justice Ozzi ruled that that the photo array identification made by McDonald was not impermissibly suggestive, because all of the individuals were sufficiently similar in appearance, hairstyle and facial features and there was no testimony indicating that McDonald was influenced in his identification. *Id.* at 111.

Regarding the lineup procedures, at the October 31 hearing, defense counsel argued that showing the video to James was unnecessary, and that it was impermissibly suggestive because it showed Petitioner "isolated," "walking with a cane, [and wearing] the green bubble jacket." *Id.* at 97. Defense counsel further argued the lineup was suggestive "because of the detective's conduct and because the detective strategically show[ed] a witness who cannot make an identification isolated videotape where my client is front and center on that with a cane" shortly before the lineup, and that the lineup included "individuals who are ten years older, one of them has an [A]fro, many of them have weight disparities." *Id.* at 98.

On November 12, after conducting additional research and conferring with the Appeals Bureau, the prosecutor conceded that the lineup and video identifications made by Mr. James were, in fact, unduly suggestive. *Id.* at 108–09. The People agreed to an independent source hearing for James so that the trial court could determine whether he should be allowed to make an in-court identification. *Id.*

## B. Independent Source Hearing

Justice Ozzi held an independent source hearing regarding James' identification on December 18, 2013. *Id.* at 120. James testified about the events

leading up to the shooting, the shooting itself, his view of the shooter, and descriptions he gave to police after the shooting. *Id.* at 128–84. At the hearing, the court denied the defense's motion to preclude James from making an in-court identification at trial. *Id.* at 188–90. The court found that — despite inconsistencies in the descriptions he provided[4] — James had a clear view of the shooter from a few feet away. *Id.* at 188–89. Accordingly, the court concluded that James had an independent basis for identifying Petitioner as the shooter apart from the unduly suggestive lineup and video identifications. *Id.* at 188–90.

### C. Motion to preclude McDonald's in-court Identification

At a *Sandoval* hearing before Justice Danny K. Chun on September 9, 2014, the People disclosed, for the first time, that McDonald had also viewed the surveillance video.[5] *Id.* at 202, 212. Defense counsel objected to the late notice, arguing that showing of the video was itself an identification procedure and that viewing Petitioner in the video, using a cane, was suggestive. *Id.* at 213. Defense counsel moved to preclude McDonald from making an in-court identification. *Id.* at 215–16. The People argued that the video viewing would not influence McDonald's ability to make a reliable in-court identification because he made the photo array

---

[4] Defense counsel highlighted that James had given inconsistent descriptions of the shooter's hair style and height to police, including that the shooter was 5' 5" and 5' 10." ECF 8-1 at 162–63.

[5] "[A] *Sandoval* hearing addresses what convictions and wrongful acts of a defendant can be used at trial in cross-examining him." *Acevedo v. Capra*, No. 13-cv-5579 (BMC), 2014 WL 1236763, at *5 n.2 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 600 F. App'x 801 (2d Cir. 2015). *See People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974).

identification prior to viewing the video, and he had viewed the video over a year-and-a-half prior to trial. *Id.* at 217. The prosecutor also stated that she had "no intention" of showing James or McDonald the video at trial and only planned to use the video with respect to the police officer witnesses. *Id.* The court then held a bench conference, off the record. *Id.*

On September 10, 2014, Justice Chun denied the defense's motion to preclude McDonald from making an in-court identification, finding that "the subsequent showing of the video is not an ID procedure." *Id.* at 298, 302. The court declined to hold an independent source hearing for McDonald. *Id.* at 303. In reaching this decision, the court reasoned that showing McDonald the video was unlikely to have a suggestive effect because Det. Chavis had not asked McDonald any questions about the video, the police had not arranged the filming of the video, and there was "very little chance that any in-court ID would be tainted" because McDonald had previously made a photo array identification. *Id.* at 301–03.

**D. Trial**

At trial, McDonald identified Petitioner as the person who shot him. *Id.* at 781–82. McDonald testified about the crime and described the shooter as using a cane. *Id.* at 777. The prosecution showed McDonald the surveillance video obtained from a nearby business, and McDonald identified the man with the green coat and cane as the person who shot him. *Id.* at 799–800.

James also identified Petitioner in court as the person who shot McDonald. *Id.* at 606. The prosecution also showed James the surveillance video, and James

identified several people in the video as having been on the train and identified the person with the cane and green jacket as the person who shot McDonald. *Id.* at 625–27. James testified about the crime and described the shooter as using a cane and wearing a light green jacket. *Id.* at 604–05. Defense counsel questioned James about discrepancies between a 9-1-1 call immediately following the shooting — in which he described a "male with the red hat, black jacket and braids," *id.* at 641, and made no mention of a man with a cane or green jacket — and later descriptions he gave to police. *Id.* at 640–41.

In total, seven police officers testified at trial. Officers Alex Guess and Darren Johansen described various observations they made while on foot patrol near the Rockaway subway station and responding to the scene of the crime, and relayed how they obtained Petitioner's name from a nearby business where they had observed him prior to the shooting. *Id.* at 676–98, 821–61. Officers Mohammed Choudhury and Juan Carlos Palacios testified about responding to the scene of the crime. *Id.* at 500–33, 552–86. These four officers testified about the descriptions they obtained from McDonald and James immediately following the shooting. Detective Douglas Chavis, the detective assigned to this case, testified about investigative procedures undertaken by police, including obtaining surveillance footage from a nearby business and the identification procedures they conducted with McDonald and James. *Id.* at 909–51.

On September 22, 2014, the jury found Petitioner guilty of attempted murder in the second degree, assault in the first degree, and two counts of criminal possession of a weapon in the second degree. *Id.* at 1071–74.

## III.    Post-Conviction Proceedings

### A. Direct Appeal

Notice of direct appeal was filed December 5, 2014, but not perfected at that time. ECF 8-4 at 3. Petitioner's appellate counsel ultimately filed his brief on direct appeal brief over three years later, on February 22, 2018.

On direct appeal, counsel for Petitioner raised four claims in support of his contention that his conviction should be reversed and a new trial ordered, or his sentence reduced. Petitioner asserted that he was deprived of due process when (1) the court denied an independent source hearing after learning that McDonald had viewed the surveillance video; (2) the court permitted bolstering testimony from four police officers and out-of-court conversations with the check-cashing teller, and allowed the prosecution to use the surveillance video for identification; and (3) the prosecution's comments on summation improperly shifted the burden of proof to the defense. In addition, Petitioner argued that (4) the trial court imposed an excessively harsh sentence as this was Petitioner's first felony conviction. State Ct. R. Ex. H Def.'s Br. at 3–4, ECF No. 8-8.

The Appellate Division affirmed the conviction on January 9, 2019. *People v. Hall*, 90 N.Y.S.3d 310 (N.Y. App. Div. 2019). The court held that Petitioner's first claim was without merit, finding "the victim's viewing of the video was not an identification procedure within the meaning of C.P.L. § 710.30." *Id.* at 311–12. The

Appellate Division also found there was "nothing inherently suggestive" in showing McDonald the video, "as the defendant was not singled out, portrayed unfavorably, or in any other manner prejudiced by police conduct or comment, or by the setting in which the defendant was taped." *Id*. at 312. The Appellate Division rejected Petitioner's claims regarding bolstering testimony as unpreserved for appellate review, waived when defense counsel elicited similar testimony on cross-examination, and lacking merit because the descriptions were probative of the witnesses' ability to observe the perpetrator. *Id*. It also rejected as meritless claims related to the prosecution's summation, ineffective assistance of counsel, and excessive sentence. *Id*.

On January 30, 2019, Petitioner sought leave to appeal to the New York State Court of Appeals. State Ct. R. Ex. K Def.'s Appl. at 2, ECF No. 8-11. The application framed Petitioner's case as presenting "a discrete" issue: whether the trial court erred in categorically ruling that showing the video to McDonald was not an "identification procedure," failing to fully consider the video's potential suggestiveness, and declining to hold an independent source hearing. *Id*. at 7–8. The application mentioned Petitioner's entire "brief in the Appellate Division, which ought to be reviewed by the Court of Appeals," and enclosed copies of the briefs and decision from the Appellate Division. *Id*. at 2. The Court of Appeals denied leave to appeal on April 19, 2019, without stating any reason for the denial. *People v. Hall*, 124 N.E.3d 762 (N.Y. 2019).

### B. The Instant Petition

Petitioner filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 on January 24, 2020.  ECF No. 1 at 7.  His habeas petition argued that he was deprived of his due process right to a fair trial for the same reasons that were raised in his direct appeal to the Appellate Division: (1) improper denial of an independent source hearing for McDonald; (2) improper (a) admission of bolstering and hearsay evidence and (b) use of the surveillance video for identification purposes; (3) prosecutorial misconduct on summation; and (4) excessive sentence.  *Id.* at 3–4.  In his amended petition dated February 20, 2023, Petitioner also asserted that he is actually innocent.  Am. Pet. at 6, ECF No. 12.

In its response, filed August 14, 2020, Respondent argues that Petitioner only fully exhausted his first claim, and his remaining claims are procedurally barred from review.  Resp. Mem. at 7, ECF No. 8.  On the merits, Respondent asserts that this claim should be denied because the state court did not err in denying an independent source hearing, and that the state court's decision was not contrary to, nor an unreasonable application of, clearly established federal law.  *Id.* at 11–15.

## LEGAL STANDARD

### I.    Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United

States." 28 U.S.C. § 2254(a). Under AEDPA, when a state court adjudicates a petitioner's habeas claim on the merits, a district court may only grant relief where the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). *See Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017). "Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded 'substantial deference.'" *Thomas v. Griffin*, No. 14-CV-0647 (DC), 2023 WL 3570969, at *6 (E.D.N.Y. May 19, 2023) (quoting *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015)). "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Id.* (alteration in original) (quoting *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012). "This is a difficult to meet and highly deferential standard" and review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations, alterations, and quotations omitted).

A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' the state court arrived at a result opposite to the one reached by the Supreme Court." *Evans v. Fisher*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law "if the

state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "In other words, a state court decision must be 'more than incorrect or erroneous.'" *Watson v. Superintendent of Greene Corr. Facility*, No. 19-CV-5098 (PKC), 2023 WL 6119709, at *16 (E.D.N.Y. Sept. 18, 2023) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "These standards are 'difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 43 (2011).

## II.    Exhaustion and Procedural Default

A petitioner in custody pursuant to a state court judgment must exhaust his state court remedies prior to seeking federal habeas review. *See* 28 U.S.C. § 2254(b)(1). "The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting]' a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation.'" *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citation omitted) (alteration in original). As the Supreme Court explained:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Smith v. Duncan*, 411 F.3d 340, 347 (2d Cir. 2005).

14

"To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation omitted). Thus, the exhaustion requirement includes two parts. First, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005) (emphasis omitted) (quoting *O'Sullivan*, 526 U.S. at 845). "In New York, this means a habeas petitioner must first appeal the relevant conviction to the Appellate Division, and then seek further review by applying to the Court of Appeals for a certificate granting leave to appeal." *Watson*, 2023 WL 6119709, at *17 (citing *Galdamez*, 394 F.3d at 74). "Second, habeas petitioners must have fairly presented [their] claims to the state courts, such that the state court had a fair opportunity to act." *Id.* (emphasis omitted) (quotation marks omitted) (quoting *Galdamez*, 394 F.3d at 73 and citing *Aparicio v. Artuz*, 269 F.3d 78, 89–90 (2d Cir. 2001) ("To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of the same federal constitutional claim[s] that he now urges upon the federal courts to the highest court in the pertinent state." (internal citation and quotation marks omitted))). A petitioner may satisfy this requirement through:

> (a) reliance on pertinent federal cases employing constitutional analysis,
> (b) reliance on state cases employing constitutional analysis in like fact
> situations, (c) assertion of the claim in terms so particular as to call to
> mind a specific right protected by the Constitution, and (d) allegation of
> a pattern of facts that is well within the mainstream of constitutional

litigation.

*Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) (quotation omitted).  However, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  *Baldwin*, 541 U.S. at 32.

"Where [a] petitioner's claims are unexhausted, the petitioner should be 'permitted to return to state court to exhaust his claims unless no state corrective procedure remains available.'"  *Licausi*, 460 F. Supp. 3d at 255 (quoting *Brown v. Senkowski*, 152 F. App'x 15, 18 (2d Cir. 2005) (summary order)).  "However, where [a] petitioner no longer has any avenue in state court to obtain review of his unexhausted federal constitutional claims, then those claims are procedurally barred under the exhaustion doctrine."  *Id.* (citing *Brown*, 152 F. App'x at 18); *see also Wynn v. Lee*, No. 11-CV-3650 (VSB) (SDA), 2020 WL 2489733, at *6 (S.D.N.Y. May 13, 2020) ("Even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law." (quoting *Ramirez v. Attorney Gen. of the State of New York*, 280 F.3d 87, 94 (2d Cir. 2001)).  A "dismissal of an application for habeas relief on the ground of procedural default amounts to 'a disposition of the habeas claim on the merits.'"  *Carvajal*, 633 F.3d at 104 (quoting *Aparicio*, 269 F.3d at 90).

There are some circumstances in which an applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim.  A petitioner may

only do so, however, "by demonstrating 'cause for the default and prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted." *Id.* (quoting *Aparicio*, 269 F.3d at 90). *See also Wynn*, 2020 WL 2489733, at *6 ("[R]eview of a claim that has not been presented to the highest state court or preserved will 'be subject to the cause and prejudice standard before reaching the merits.'" (quoting *Ramirez*, 280 F.3d at 94)).

## DISCUSSION

The Court liberally construes this *pro se* petition "to raise the strongest arguments it suggests," while continuing to apply the procedural and substantive rules that govern his petition under AEDPA. *Mejia v. Superintendent, Elmira Corr. Facility*, 702 F. Supp. 3d 83, 93 (E.D.N.Y. 2023) (KAM).

For the reasons that follow, the Court finds Petitioner's second, third, and fourth claims are procedurally defaulted. As for his first claim for habeas relief — that the state trial court denied him due process by failing to hold an independent source hearing — the Court denies that claim on the merits.

## I. Petitioner's Second, Third, and Fourth Claims are Procedurally Defaulted

Petitioner's Application for Leave to Appeal to the New York Court of Appeals described his appeal as constituting a single issue — the issue raised in claim (1). The application certified that there is "*a* question of state law and federal constitutional law." ECF No. 8-11 at 2 (emphasis added). The supporting letter described his case as presenting "a discrete and straightforward question of law," and discussed only the facts relevant to the question of whether McDonald's viewing of

the surveillance video was a potentially suggestive identification procedure that merited an independent source hearing. *Id.* at 4–6. The application made no reference to the other claims raised in his appeal to the Appellate Division, which are parallel to claims (2), (3), and (4) in his habeas petition. The application enclosed briefs filed with the Appellate Division, as well as the Appellate Division's decision, and stated Petitioner's brief in the Appellate division "ought to be reviewed by the Court of Appeals." *Id.* at 2.

Petitioner's first claim is that he was "deprived of his due process right to a fair trial when the court denied an independent source hearing" after learning that McDonald had viewed the surveillance video. ECF No. 1 at 2. Respondent agrees that this claim is fully exhausted. Resp. Mem. at 9. Petitioner's Application for Leave to Appeal to the New York Court of Appeals challenged the trial court's denial of an independent source hearing for McDonald and described the appeal as raising a federal constitutional question. ECF 8-11 at 8, 2. The application fairly presented the "essential factual and legal premises" of this specific claim to the highest state court and alerted the court to the constitutional nature of the claim. *See Jackson*, 763 F.3d at 133. Therefore, this Court can reach the merits of claim (1).

By contrast, because Petitioner's application to the Court of Appeals made no reference to the other claims raised in his appeal to the Appellate Division, which are parallel to claims (2), (3), and (4) in his habeas petition, those claims are unexhausted. Although Petitioner enclosed briefs as part of his application filed with the Appellate Division, as well as the Appellate Division's decision, and stated that his brief in the

Appellate division "ought to be reviewed by the Court of Appeals," ECF No. 8-11 at 2, that could reasonably have been construed by the Court of Appeals as a suggestion that the Court review the lower-court briefing for a more detailed discussion of the "discrete issue" on which he sought leave to appeal, not the other issues he had presented below. In any event, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32. Thus, claims (2), (3), and (4) were not "fairly presented" to the Court of Appeals and are therefore unexhausted. *See Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000) ("Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims."); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) ("The only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court. This did not fairly apprise the court of the two claims.").

In some instances, a petitioner may return to state court to raise previously unexhausted claims. In this case, Petitioner has already pursued his direct appeal, but does not appear to have yet sought collateral relief under N.Y. Crim. Proc. Law § 440.10. However, New York procedural rules appear to bar Petitioner from attempting to further litigate claims (2), (3), and (4) before the state's highest court through either the direct appeal or collateral review process. Petitioner is barred

from seeking leave to appeal these claims directly because he has already made one request for leave to appeal. *Grey*, 933 F.2d at 120 ("Petitioner cannot again seek leave to appeal these claims in the Court of Appeals because he has already made the one request for leave to appeal to which he is entitled."). Petitioner also may be barred from collateral review of these claims, at least as currently presented, because the state court previously ruled on their merits on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(a),(c).

Thus, his present habeas claims (2), (3), and (4) are unexhausted but procedurally barred from review. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006) ("[I]f state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court."). Procedurally defaulted claims "must . . . be dismissed without reaching the merits," unless the petitioner establishes a reason that the claims should be exempt. *Grey*, 933 F.2d at 121.

"A federal habeas court may not review a procedurally barred claim on the merits unless the petitioner can demonstrate 'cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.'" *Terrell v. Kickbush*, No. 17-CV-7027 (JFB), 2019 WL 3859512, at *5 (E.D.N.Y. Aug. 16, 2019) (alteration omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). "A

20

petitioner can demonstrate cause as follows: (1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *Licausi*, 460 F. Supp. 3d at 256 (quotation omitted). "Prejudice can be demonstrated by showing that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (quotation omitted). "Finally, a miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation has probably resulted in the conviction of one who is actually innocent, which means, the petitioner must demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* at 256–57 (quotation omitted). *See also Hyman v. Brown*, 927 F.3d 639, 655–57 (2d Cir. 2019).

Here, Petitioner has not established cause. Instead, the record demonstrates that his claims were abandoned when he appealed the Appellate Division's decision to the Court of Appeals. *See Wynn*, 2020 WL 2489733, at *7 ("Petitioner makes no showing of cause or of prejudice — as his claims were merely abandoned in his application to the New York Court of Appeals . . . ." (quotation omitted)).

In his amended petition, Petitioner references a claim of actual innocence, which he states "is rooted on the concepts of the Constitutional right to substantive and procedural due process and the Constitutional right not to be subjected to cruel and unusual punishment." ECF 12 No. at 6. While a credible claim of actual

innocence can provide an exemption to certain procedural bars, a petitioner must present "new reliable evidence . . . that was not presented at trial," sufficient to persuade the court that no reasonable juror who had seen the evidence would have voted to convict him beyond a reasonable doubt. *House v. Bell*, 547 U.S. 518, 537 (2006) (quotation omitted). *See also Ruiz-Solano v. Russell*, No. 22-CV-02303 (HG), 2023 WL 3092880, at *7 (E.D.N.Y. Apr. 26, 2023) ("For the claim to be credible, it must be supported by new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." (quoting *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012)).

Since Petitioner has not presented any new evidence to support his claim of actual innocence, it does not serve as an exemption to procedural default on claims (2), (3), and (4). On the other hand, the Court takes no position on whether, were he to present a claim for relief based on newly discovered evidence to the state court through a motion for relief filed under N.Y. Crim. Proc. Law §440.10-(1)(g) or otherwise, he might obtain such relief in the New York courts. The Court simply holds that Petitioner has presented no evidence that meets the extremely high bar needed to excuse his procedural default in this habeas petition.

## II.    Whether Petitioner was Entitled to an Independent Source Hearing

Petitioner argues that the trial court deprived him of due process when it allowed McDonald to make an in-court identification despite having been shown what he contends was an impermissibly suggestive crime scene video, without holding an independent source hearing. For the reasons that follow, however, Petitioner is not

entitled to habeas relief on this claim, because the Appellate Division's conclusion that no independent source hearing was necessary was not contrary to federal law, nor was it an unreasonable application of United States Supreme Court precedent.

## A. Last Reasoned Opinion

As a preliminary matter, there is a rebuttable presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). The presumption that a court "looks through . . . to the last reasoned decision" can be rebutted if a petitioner asserts "details of state law . . . [that] would constitute *strong* evidence that the presumption, as applied, is wrong." *Id.* at 804–05.

The New York Court of Appeals did not provide reasons for its denial of Petitioner's application for leave to appeal. *Hall*, 124 N.E.3d 762. Applying the *Ylst* presumption — as there is no evidence that the presumption should be rebutted in this case — the Court will base its review on the Appellate Division's decision as this was the last reasoned state court opinion to address the claims raised by Petitioner. *See, e.g.*, *Williams v. Goord*, 277 F. Supp. 2d 309, 318 (S.D.N.Y. 2003) (VM) ("When a state appellate court affirms the denial of a claim without comment, this Court must look to the last 'reasoned' state court opinion to determine and presume the state appellate court's reasoning.").

The Appellate Division's decision affirming Petitioner's conviction denied each of his claims on the merits. *Hall*, 90 N.Y.S.3d at 310–12.[6] The Appellate Division found claim (1), that the Supreme Court erred in denying an independent source hearing for McDonald, to be "without merit." *Id.* at 311–12. Federal review of Petitioner's claim is therefore subject to the standard of deference described in AEDPA. In other words, the Court may only grant habeas relief if the "state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Ball v. Stevenson*, No. 19-CV-5310 (ERK), 2021 WL 76835, at *6 (E.D.N.Y. Jan. 8, 2021) (quoting 28 U.S.C. § 2254(d)).

## B. Merit of Petitioner's Claim

"The purpose of an independent source hearing is to determine whether identification testimony made by a witness under *suggestive* circumstances has a separate independent source that would render it reliable." *Castillo v. Walsh*, 443 F. Supp. 2d 557, 569 (S.D.N.Y. 2006) (VM) (citing *People v. Chipp,* 552 N.E.2d 608, 613 (N.Y. 1990) ("Absent some showing of impermissible suggestiveness . . . , there is no

---

[6] On claim (2), the court ruled on the merits that the "police testimony did not constitute improper bolstering," and also held the issue to be unpreserved for appellate review and waived when defense counsel elicited similar testimony. *Hall*, 90 N.Y.S.3d at 312. The court found claim (3) of prosecutorial misconduct on summation to be "without merit," and denied claim (4) on the merits, ruling that "[i]n view of the serious nature of the offense and the defendant's criminal history, the sentence imposed was not excessive." *Id.*

burden upon the People, nor is there any need, to demonstrate that a source independent of the pretrial identification procedure exists for the witness's in-court identification."). Thus, "[a]n independent source hearing is necessary only when a hearing court has determined that pre-trial identification procedures were unduly suggestive." *Williams v. Artus*, 691 F. Supp. 2d 515, 529 (S.D.N.Y. 2010) (JGK) (citing *United States v. DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987)); *see also Sweeper v. Graham*, No. 14-CV-6346 (CM), 2017 WL 4516645, at *6 (S.D.N.Y. Sept. 26, 2017) ("An independent source is required only when a lineup is unduly suggestive . . . ." (quotation omitted)); *Hearns v. Artus*, No. 08-CV-192 (NGG), 2010 WL 2653380, at *11 (E.D.N.Y. June 23, 2010) ("Where a trial court properly finds that identification procedures are not impermissibly suggestive, 'independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury.'" (quoting *Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir. 1986)).

Similarly, "[w]hen a witness has made a pretrial identification, a challenge to that identification and to an in-court identification of the defendant at trial triggers 'a one-step or two-step inquiry.'" *Booker v. Ricks*, No. 02-CV-6456 (JG), 2006 WL 2239243, at *11 (E.D.N.Y. Aug. 4, 2006) (quoting *United States v. Maldonado-Rivera,* 922 F.2d 934, 973 (2d Cir.1990)). "The first step is to determine whether the pretrial identification procedures were unnecessarily suggestive." *Id.* (citing *Maldonado-Rivera,* 922 F.2d at 973). "If they were not, the challenge is denied, and the reliability of the identification is a question only for the jury." *Id.* (citing *Jarrett,* 802 F.2d at

42)).  *See also Ragunauth v. Ercole*, No. 07 CV 1692 (NG), 2008 WL 5401586, at *10
(E.D.N.Y. Dec. 23, 2008) ("If the court determines that the out-of-court identification
procedures of petitioner were not unduly suggestive, the court's inquiry ends, and the
reliability of the identification becomes a question for the jury.").

The trial court denied Petitioner's initial motion for an independent source
hearing on two grounds.  First, the trial court ruled that "subsequent showing of the
video is not an ID procedure."  ECF No. 8-1 at 302.  On this point, the court
emphasized that the video was surveillance video that the police had not arranged.
*Id.* at 302–03.  The court also confirmed with counsel that the detectives did not ask
McDonald any questions and McDonald "just viewed" the video without identifying
anyone.  *Id.* at 301–03.  Second, the court declined to hold an evidentiary hearing to
determine whether McDonald had an independent source for the identification
because there was "very little chance any in-court ID would be tainted by" viewing
the video.  *Id.* at 303.  The trial court principally relied on the fact that McDonald had
previously identified Petitioner from a photo array identification, a procedure that
was conducted long before he viewed the video.  *Id.* at 303.

The Appellate Division rejected Petitioner's claim that the trial court erred in
denying an independent source hearing and affirmed both reasons provided by the
trial court.  *Hall*, 90 N.Y.S.3d at 311–12.  The Appellate Division found that there
was "nothing inherently suggestive" in showing the surveillance video to McDonald
because "the defendant was not singled out, portrayed unfavorably, or in any other
manner prejudiced by police conduct or comment, or by the setting in which the

defendant was taped." *Id*. at 312. Agreeing with the trial court, the Appellate Division also stated that the "victim's viewing of the video was not an identification procedure." *Id*. (citing *People v Gee*, 782 N.E.2d 1155, 1158 (N.Y. 2002) (finding that the showing of surveillance video to a robbery witness was not an identification procedure because the witness was "simply ratifying the events as revealed in the videotape, without identifying any known individual as the robber").

The trial court and Appellate Division's conclusion that showing McDonald a surveillance video was not a suggestive identification procedure was not an unreasonable application of clearly established federal law to the facts presented here, nor an unreasonable determination of the facts. As both courts discussed, the police officers did not ask McDonald any questions, nor did McDonald identify anyone.[7] *Cf. United States v. Turner*, No. 18-CR-00068 (ALC), 2023 WL 1364888, at *8 (S.D.N.Y. Jan. 31, 2023) ("Here, Witness-1 pointed to the only individual depicted in the surveillance video and stated 'that's the guy.' The Court understands this to be a suggestive showup identification procedure."). And as these courts noted, McDonald had already identified Petitioner in a photo array — a procedure that the

---

[7] The trial court credited the People's representation that "the detective was making sure that no one else was involved in the shooting," and showing the video "wasn't for identification purposes" because Petitioner had already been arrested, ECF No. 8-1 at 212, and that Det. Chavis did not ask McDonald any questions about the video. *Id*. at 302.

defense agreed was not unconstitutionally suggestive, even while arguing at trial that Petitioner had been misidentified — *before* he was shown the surveillance video. [8]

Even assuming that Petitioner is correct that the surveillance video was both an "identification procedure" and that it impermissibly reinforced his earlier photo identification through suggestive means, he has not shown that the circumstances under which this video was shown to McDonald rendered the witness's subsequent in-court identification unreliable, as that test has been set forth in Supreme Court precedent. *See, e.g.*, *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 205 (2d Cir. 2010) (applying "reliability" test to find that "[petitioner's] due process rights were not violated" because the witness's identification "did not hinge on specific identification procedures"). More fundamentally, this Court cannot say that the Appellate Division — which denied the claim on the merits — was unreasonable in its application of these legal principles to Petitioner's case. *See Vega*, 669 F.3d at 126 (federal habeas relief requires finding that the last reasoned state court decision was "so lacking in justification that there was . . . [no] possibility for fairminded disagreement" about the correct application of Supreme Court precedent (alteration in original)).

In sum, because the state court determined that showing McDonald the surveillance tape months after he had already made a positive identification of

---

[8] Indeed, at a pretrial hearing, the trial court stated that the individuals pictured in the photo array all had "some facial hair," "short cropped hair," and sufficiently similar skin tone such that there was "nothing which draws the view of attention" to Petitioner. ECF No. 8-1 at 111. And Petitioner's trial counsel conceded that the photo array itself was not suggestive. *Id.* at 97.

28

Petitioner from a lawfully administered photo array was not an unduly suggestive identification procedure, and that conclusion was not an unreasonable application of clearly established federal law, Petitioner is not entitled to federal habeas relief on his claim that he was wrongly denied an independent source hearing.

## **CONCLUSION**

For the reasons explained above, the petition for habeas relief under 28 U.S.C. § 2254 is denied. This decision is without prejudice to Petitioner's ability to pursue any further state post-conviction remedies that may be available to him under New York law, even if such claims assert his actual innocence or otherwise turn on his contention that he was misidentified by one or more eyewitnesses to the crime.

The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) because the petitioner has failed to make a substantial showing of the denial of a constitutional right. The Clerk is directed to enter judgment dismissing the petition and closing this case. Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal taken from this decision and order would not be taken in good faith and therefore *in forma pauperis* status is denied for purposes of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

_/s/ Nina R. Morrison_

NINA R. MORRISON
United States District Judge

Dated:  February 10, 2025
        Brooklyn, New York

29